UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CURTRINA MARTIN et al., | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. |
| UNITED STATES OF AMERICA et al., | 1:19-cv-04106-JPB |
| Defendants. | |

| | |
|---|---|
| HILLARD TOI CLIATT, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. |
| UNITED STATES OF AMERICA et al., | 1:19-cv-04180-JPB |
| Defendants. | |

## <u>ORDER</u>

This matter is before the Court on the United States of America ("United States") and FBI Special Agent Lawrence Guerra's ("Guerra") (collectively "Defendants") Motion for Summary Judgment ("Motion").  ECF No. 83.  Having fully considered the papers filed therewith and the parties' oral argument, the Court finds as follows:

## I.  **BACKGROUND**

Plaintiffs Curtrina Martin, Martin's minor child and Hilliard Toi Cliatt, III (collectively "Plaintiffs") asserted claims against the United States under the Federal Tort Claims Act (the "FTCA") and against Guerra under the Fourth Amendment in connection with a warrant that was inadvertently executed at Plaintiffs' home.[1]

In 2015, the FBI initiated an operation concerning violent gang activity in Georgia.  The operation ultimately resulted in criminal indictments against thirty individuals, including Joseph Riley ("Riley").  Arrest and search warrants were thereafter issued for the indictees.

The FBI prepared an Operation Order, which, among other things, provided background information regarding the case and instructions on how to execute the warrants.  For example, the Operation Order provided that seven search warrants and seventeen arrest warrants, including warrants for Riley's arrest and the search of his home located at 3741 Landau Lane SW, Atlanta, Georgia ("3741 Landau"), would be executed simultaneously on October 18, 2017, at 5:00 a.m.

The FBI also prepared a SWAT Addendum to the Operation Order, which described SWAT-specific tactical considerations.  The SWAT Addendum

---

[1] Curtrina Martin and her child filed a joint complaint, and Hilliard Cliatt filed separately.  The cases are now consolidated.

instructed the teams to achieve a near simultaneous execution of the warrants to ensure surprise and included information specific to the SWAT team, such as breaching the front door and deploying flash bangs.

Based on the FBI's determination that Riley posed a high risk of violence, a SWAT team was designated to enter Riley's home and secure it for other FBI personnel to execute the warrants. The SWAT Addendum for 3741 Landau and Riley included a description and photograph of the home; an overhead image of the neighborhood with a pin denoting 3741 Landau; step-by-step directions to the property with a corresponding map; photographs of Riley; Riley's physical description; and information regarding Riley's alleged history of violence and gun possession.[2]

Guerra was assigned to lead the SWAT Team that would execute the warrants at 3741 Landau. He received the names of his SWAT team members as well as the Operation Order and SWAT Addendum.

To prepare for the warrant executions at 3741 Landau, Guerra testified that he conducted a site survey of 3741 Landau in October 2017 (the "Site Survey").

---

[2] Some of the information in the SWAT Addendum was gathered by FBI Task Force Officer Joshua Thompson ("Thompson") during his surveillance of 3741 Landau for more than two hours on October 3, 2021. In addition to driving by the home and discreetly taking photographs of it, Thompson observed the home from a side street using binoculars.

As part of the Site Survey, Guerra states that he noted that the residence was a beige split-level home located on a corner lot with a large tree; it had a tight stairway and stoop leading to the front door; and it had windows on either side that would make tactical entry difficult and leave agents vulnerable in case of gunfire.

Guerra states that after conducting the Site Survey, he identified a nearby parking lot to be used as a staging area for the team executing the 3741 Landau warrants. Guerra communicated the location of the staging area to the team via email on October 16, 2017. Guerra also wrote tactical notes, which specified the "stack" formation or order in which SWAT team members would position themselves outside the front door and who would breach the door, carry a shield and go upstairs or downstairs upon entry.

On October 17, 2017, Guerra attended a briefing regarding the operation, which included a presentation on the warrants to be served on Riley and executed at 3741 Landau the next day.

Guerra and FBI Special Agent Michael Lemoine ("Lemoine") testified that at approximately 3:30 a.m. on October 18, 2017 (the morning the warrants were to be served), they traveled to 3741 Landau to determine whether any unexpected conditions existed at the target that could impact the operation (the "Drive-By"). Such conditions included evidence that the occupants were awake. Guerra testified

that it was dark outside, and he dimmed his vehicle's headlights to avoid detection. He stated that the personal GPS device that he used for navigation led him to a home he believed was 3741 Landau.  At that home, Guerra testified that he observed a tan split-level home on a corner lot with a large tree, which he recalled from his Site Survey.  Guerra reported that he noticed the street sign for Landau Lane, a garage at the side of the home, a stoop in front of the home and four windows to the right of the stoop.  Guerra and Lemoine both testified that they observed a black Camaro car in the driveway of the home, which Guerra noted as a future reference point.  Lemoine and Guerra discussed that the black Camaro car was not present at the home during Guerra's previous visit.[3]

It turns out that Guerra and Lemoine were at Plaintiffs' home, located at 3756 Denville Trace SW, Atlanta, Georgia ("3756 Denville"), instead of at 3741 Landau.  Plaintiffs' home, which also faces Landau Lane, is three or four houses down from 3741 Landau.  The address of 3756 Denville is not affixed to the front of the home or anywhere else on the building.  It is posted on the mailbox at the end of the driveway on the side of the house located on Denville Trace.

---

[3] Riley was not known to operate a black Camaro car or associate with anyone who did.  The SWAT Addendum listed several other vehicles as associated with Riley, including a white Nissan car.

Guerra testified that he and Lemoine subsequently returned to the staging area to brief the other personnel participating in the operation. Shortly before 5:00 a.m., a caravan of federal agents and Atlanta Police Department officers left the staging area for 3741 Landau. It was still dark outside. When Guerra arrived at the home he believed to be 3741 Landau, he directed the driver of his vehicle to stop. Guerra was at 3756 Denville, but neither he nor the other agents realized the error at that time.

Once the SWAT Team was in place, Guerra states that he knocked on the door and announced law enforcement's presence. Plaintiffs were asleep in their bedroom and stated that they did not hear the knock. After waiting ten to twenty seconds, Guerra directed an agent to breach the front door. Another agent deployed a flash bang. The team entered Plaintiffs' home at or about 5:00 a.m.

Plaintiffs hid in their bedroom closet after the agents entered the home but were quickly found. The agents removed Cliatt from the closet, dragged him to the bedroom floor and handcuffed him. No agent touched Martin.

Shortly after agents detained Cliatt, Guerra entered the bedroom and noticed that Cliatt did not have the same tattoos as Riley. Guerra then asked Cliatt to provide his name and address. Around that time, Lemoine noticed mail bearing a different address than 3741 Landau. Upon realizing that they were in the wrong

home, the agents ended the search and uncuffed Cliatt. Guerra told Plaintiffs he would return to explain what happened. The agents were in the home for no more than five minutes.

At or about 5:07 a.m., Guerra and the team executed the warrants at 3741 Landau. Guerra thereafter returned to Plaintiffs' home and apologized for the error. He provided his business card and took photographs of the damage caused by the forced entry. Guerra also provided the name of the FBI's Chief Division Counsel who would be responsible for the incident.

Guerra testified that he stopped using his personal GPS device after the incident, and he threw it away not long after that. The device was therefore not available for Plaintiffs' inspection during discovery or for corroboration of Guerra's testimony.

The FBI's agency representative testified that when preparing to execute a gang-related warrant, an FBI agent typically conducts a site survey of the target location to the extent feasible. However, no FBI policy or procedure dictates how to locate or navigate to the target, whether to use a GPS device or what type of GPS device must be used, whether or how to conduct a site survey or drive-by of a target location or how long to wait before entering after knocking and announcing. These decisions are left to the personnel involved in the specific operation.

7

Plaintiffs dispute several facts relating to Guerra's preparation to serve and execute the warrants. They assert that the absence of corroborating geo location and meta data raises questions regarding the veracity of Guerra's testimony that he completed the Site Survey and the Drive-By. Specifically, Plaintiffs challenge that: (i) GPS data is not available for Guerra's device at the time he states he completed the Site Survey and the Drive-By but is available for the hours following the execution of the warrants; (ii) available geo location data for Lemoine's device calls into question whether he participated in the Drive-By; (iii) no metadata is available for the photographs that Guerra asserts he took of 3741 Landau during his Site Survey; (iv) Guerra and FBI Agent Gregory Donovan ("Donovan") initially testified that they conducted the Site Survey together, but geo location data from Donovan's cellular telephone indicates that he did not visit 3741 Landau during the relevant period; and (v) Guerra disposed of his personal GPS device after the incident, even though he gave Plaintiffs the contact information for the Chief Division Counsel and should have anticipated that there could be litigation regarding the incident. Plaintiffs conclude that a reasonable juror could determine, based on these facts, that Guerra did not conduct the Site Survey or Drive-By prior to executing the warrants.

Defendants respond that Guerra's testimony regarding the Site Survey and Drive-By is corroborated by photographs of the home that only Guerra testified to have taken; an October 16, 2017 e-mail from Guerra to the team identifying the staging area, which Guerra asserts he identified as part of the Site Survey; and Guerra's tactical notes written prior to the execution of the warrant and reportedly based on the Site Survey.

Defendants further explain that the FBI was unable to find geo location data for seven of the sixteen FBI personnel who participated in the warrant executions and that there is no evidence that such data was destroyed or withheld from Plaintiffs. Defendants also argue that geo location data that is available for Lemoine's device shows that he arrived at the staging area at approximately 3:26 a.m. on the morning of October 17 and that he left the staging area between 3:31 a.m. and 3:42 a.m., which would have been sufficient time for Guerra and Lemoine to complete the Drive-By and return to the staging area.[4]

Additionally, Defendants assert that Guerra executed the declaration in this case more than two years after the Site Survey, and at that time, both he and Donovan believed that they had conducted the Site Survey together in accordance with their common practice. Defendants explain that after they learned that geo

---

[4] The record does not show where Lemoine went, and data is not available for his device between 3:43 a.m. and 4:48 a.m.

location data indicated that Donovan was not present at the Site Survey, both agents corrected the declaration testimony during their depositions.

Defendants also contend that FBI policy did not require Guerra to preserve his personal GPS unit, and the obligation to preserve the unit materialized only when the unit became discoverable in litigation. Defendants maintain that Guerra provided the Chief Division Counsel's contact information to Plaintiffs to facilitate reimbursement for the damage to Plaintiffs' home and not because Guerra believed litigation would arise from the incident.

II.    **ANALYSIS**

A.    **Legal Standard**

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56) (quotation marks omitted). A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court . . . is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Allen*, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact.  *See id.*  "[I]n deciding whether the movant has met this burden[,] the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party."  *Id.*

After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating summary judgment is improper because a material issue of fact does exist.  *Id.*  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  In the same vein, "'some metaphysical doubt as to the material facts'" is not sufficient to create a genuine dispute.  *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (stating that "the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment") (citation omitted).

In sum, if the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## B.    Qualified Immunity

The doctrine of qualified immunity protects government officials from civil liability for actions taken within the scope of their discretionary authority unless their conduct violated a plaintiff's federal constitutional rights as demonstrated by clearly established law. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). "The defense of qualified immunity aims to strike a balance between 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Taylor v. Taylor*, 649 F. App'x 737, 742 (11th Cir. 2016). Thus, the doctrine "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

The burden is on the defendant to raise the qualified immunity defense. *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). Once the defendant does so, the burden shifts to the plaintiff to show that qualified immunity should not apply. *See id.*

Courts in the Eleventh Circuit "conduct a two-step inquiry to decide whether qualified immunity should be granted: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[?]; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, … [was] the right . . . clearly established[?]" *Shuford v. Conway*, 666 F. App'x 811, 815 (11th Cir. 2016).

"Both elements must be satisfied for an official to lose qualified immunity." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (citation omitted). However, "the two steps do not have to be analyzed sequentially." *Id.* If the law was not clearly established at the time of the incident, the court need not decide if the defendant actually violated the plaintiff's rights. *See id.*; *Maughon v. City of Covington*, 505 F. App'x 818, 821 (11th Cir. 2013) (stating that "[the court] need not conduct [the] qualified immunity analysis in any specific order; rather, [the court is] permitted to exercise [its] sound discretion in deciding which prong of [the] inquiry to address first").

With these principles in mind, the Court turns to the substance of Plaintiffs' Fourth Amendment claim against Guerra.

Defendants contend that Plaintiffs' Fourth Amendment claims should be dismissed on qualified immunity grounds because Guerra was acting within the scope of his discretionary authority, and Plaintiffs have failed to show that the alleged constitutional right was clearly established at the time of the incident. Since Plaintiffs do not dispute that Guerra was acting within the scope of his discretionary authority,[5] the burden shifts to Plaintiffs to show that qualified immunity is inappropriate here. *See Lewis*, 561 F.3d at 1291. To evaluate whether Plaintiffs have satisfied their burden in this regard, the Court turns first to the second prong of the qualified immunity test (clearly established law).

Even where an officer is found to have violated a plaintiff's Fourth Amendment right, the doctrine of qualified immunity bars recovery unless the plaintiff can show that the violated right was clearly established at the time of the incident. *See Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir. 2016). Thus, the plaintiff must show that at the time of the officer's conduct, the law was clear such that every reasonable official would have understood that the conduct would be unlawful under the circumstances. *See District of Columbia v. Wesby*, 138 S. Ct.

---

[5] The only discussion of discretion in Plaintiffs' brief relates to their argument that the discretionary function exception does not bar their claims under the FTCA.

577, 589 (2018).  In other words, "existing law must have placed the constitutionality of the officer's conduct beyond debate.  This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal citation and punctuation omitted).

To that end, the Supreme Court of the United States has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced.'"  *Id*. at 590 (citation omitted).  "It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Id*.

A plaintiff demonstrates the requisite rule by citing "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."[6]  *See Smith*, 834

---

[6] Only binding precedent—decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state—can establish a constitutional right beyond debate. *See Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019).  However, "non-binding persuasive authority can be used to indicate that a particular constitutional

F.3d at 1297 (citation omitted).  When relying on case law, a "close factual fit between the pre-existing case and the present one is essential," and "[g]eneral propositions from earlier decisions will not do."  *Cantu v. City of Dothan*, 974 F.3d 1217, 1232 (11th Cir. 2020).  The key is whether the law gave the defendant "fair warning" at the time he engaged in the conduct that his actions were unconstitutional.  *Id*.

Here, Plaintiffs point to the Supreme Court's opinion in *Maryland v. Garrison*, 480 U.S. 79 (1987) and the Eleventh Circuit's decision in *Hartsfield v. Lemacks*, 50 F.3d 950 (11th Cir. 1995) as clearly establishing that Guerra's actions in this case violated Plaintiffs' Fourth Amendment rights.  In *Garrison*, police officers executed a search warrant on a home described as occupying the "third floor" of an apartment building.  480 U.S. at 81.  After the police officers began searching the plaintiff's apartment, which was located on the third floor of the building, they realized that there were two apartments on the floor and that they had entered the wrong home.  *Id*. at 86-87.  They discontinued the search at that point.  *Id*. at 87.

In analyzing the case, the Supreme Court "recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and

---

right is *not* clearly established."  *Corbitt v. Vickers*, 929 F.3d 1304, 1319 n. 14 (11th Cir. 2019) (emphasis added).

difficult process of making arrests and executing search warrants." *Id*. The Supreme Court noted, among other things, that the officer who obtained the warrant had verified the information obtained from a reliable informant, examined the exterior of the building and sought information from the utility company serving that address. *Id*. at 81. Ultimately, the Court found that because the "objective facts available to the officers at the time suggested no distinction between the plaintiff's apartment and the target's apartment," the officers' search did not violate the plaintiff's Fourth Amendment rights. *Id*. at 88.

At issue in *Hartsfield* was whether an officer's mistake in serving a warrant on the wrong home was reasonable where (i) he did not verify that he was leading the other officers to the correct address as listed on the warrant; (ii) he did not perform any "precautionary measures" to avoid the mistake; (iii) the raid took place during the day, and the numbers on the houses were clearly marked; and (iv) the plaintiff's and the target's homes had distinguishable features and were located on different parts of the street, separated by at least one other residence. 50 F.3d at 955. The Eleventh Circuit explained that because the officer "did *nothing* to make sure that he was leading the other officers to the correct residence," he was not protected by the doctrine of qualified immunity. *Id*. (emphasis added). Also important to the court were the facts that the officer had visited the correct

residence the day before the search and had obtained the search warrant based on

his own observations of a drug transaction at the home. *Id*. The court emphasized

that the officer's actions "were simply not 'consistent with a reasonable effort to

ascertain and identify the place intended to be searched.'" *Id*. (citing Garrison, 480

U.S. at 88–89). The court concluded that it was "clearly established law that,

absent probable cause and exigent circumstances, a warrantless search of a

residence violates the Fourth Amendment, unless the officers engage in reasonable

efforts to avoid error." *Id*.

The foregoing cases demonstrate that a central issue in determining whether

the doctrine of qualified immunity applies in a Fourth Amendment search warrant

case is where to draw the line between reasonable and unreasonable measures

taken to avoid error. To assist in this inquiry, the Eleventh Circuit has cautioned

that "[n]one of [its] precedents holds—or logically compels the conclusion—that

an officer's well-intentioned attempts to ascertain and identify the property

described in a warrant are [un]reasonable simply because they lead to an error, or

because more accurate means of ascertaining the property's identity were

available." *White v. Mclain*, 648 F. App'x 838, 841 (11th Cir. 2016). Indeed, "[t]o

be reasonable is not to be perfect, and so the Fourth Amendment allows for some

mistakes on the part of government officials, giving them 'fair leeway for

enforcing the law in the community's protection.'" *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Based on these principles, the court in *White* found that an officer who "did attempt to ascertain and verify that he had the right house," including by revisiting the block where the house was located and taking a photograph of what he thought was the correct house, was protected by the doctrine of quality immunity. *White*, 648 F. App'x at 842-43. That court discussed the Eleventh Circuit's prior opinion in *Hartsfield* and disagreed that that opinion stood for the proposition "that an officer who attempts to ascertain and verify the identity of the place to be searched violates the Fourth Amendment if he fails to do everything possible to ensure that he is not mistaken." *White*, 648 F. App'x at 843. To the contrary, the court focused on the steps the officer took in preparing to serve the warrant to determine whether the officer's actions were reasonable and passed muster. *See id*; *see also Norris v. Hicks*, 855 F. App'x 515, 523–24 (11th Cir. 2021) (finding that officers who carefully planned a high-risk raid at the home of a dangerous person were entitled to qualified immunity where they encountered unexpected circumstances that resulted in the warrant being executed at the wrong home).

Here, the Court has reservations regarding whether Plaintiffs' argument that Guerra failed to complete the Site Survey and the Drive-By presents a genuine dispute of the facts. The evidence Plaintiffs offer in support of their contention requires inferential leaps that are not necessarily supported by the record. For example, missing geolocation data for the morning of the Drive-By does not necessarily mean that the Drive-By did not occur, especially in light of the corroborating deposition testimony of Lemoine that the Drive-By did occur. To survive summary judgment, Plaintiffs must do more than raise "'metaphysical doubt'" regarding the facts. *Garczynski*, 573 F.3d at 1165 (citation omitted). They must produce substantial evidence demonstrating that there is a genuine issue of material fact. *See id*.

Even if, for argument's sake, the Court credits Plaintiffs' argument that Guerra did not conduct the Site Survey and the Drive-By, the record contains undisputed evidence of several other steps that Guerra took to "ascertain and identify" the home described in the warrant. *White*, 648 F. App'x at 841. Guerra reviewed the Operation Order and Swat Addendum; he attended an operational briefing; and he selected a staging area and made tactical notes with knowledge and in consideration of the location of the home. These steps constitute considerably more than "nothing." *Hartsfield*, 50 F.3d at 955. The record also

20

contains evidence of detailed planning by other agents, including Agent

Thompson's surveillance of 3741 Landau, upon which Guerra relied. The Court

considers Guerra's overall preplanning to constitute significant "precautionary

measures" to avoid mistake. *Id*. The Court further finds that those measures were

reasonable under the circumstances. *See Heien*, 574 U.S. at 60 (noting that the

Supreme Court has "repeatedly affirmed" that "the ultimate touchstone of the

Fourth Amendment is reasonableness") (citation and punctuation marks omitted).

Moreover, the execution of the warrant occurred in the dark, and the house

number was not affixed anywhere on the house. It was listed on a mailbox at the

end of the driveway on another street, and Plaintiffs agreed during oral argument

that checking the mailbox at that location in the midst of executing the warrant

would have caused some delay in the operation. Such delay could have been

problematic because the warrant was being served on a dangerous individual under

the cover of darkness, and the simultaneous execution of multiple related warrants

was important to the overall operation.

While, as Plaintiffs point out, 3741 Landau and 3756 Denville were

dissimilar in some respects and were separated by three or four homes, Plaintiffs

do not dispute that the two homes shared several conspicuous features, including a

corner lot with a large tree and a tight stairway leading to the front door. In all, it

is not the role of the Court (and, indeed, the Court is ill-equipped) to play Monday morning quarterback and dictate what additional steps Guerra should have taken in the universe of measures available to him.

That Guerra's efforts were ineffectual is not a basis to find that he acted unreasonably and in violation of the law. The Supreme Court emphasized in *Messerschmidt* that the doctrine of qualified immunity "'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt*, 565 U.S. at 546 (citation omitted). The Court cannot conclude based on the record before it that Guerra was either incompetent or that he knowingly broke the law. To the contrary, the record supports the conclusion that Guerra simply made a mistake— based on reasonable but mistaken judgment. Guerra's actions are therefore excused under the law. *See id*; *Heien*, 574 U.S. at 60–61 (stating that the Fourth Amendment allows leeway for mistakes by government officials).

Importantly, courts have granted immunity in cases that reflect preparations similar to the steps Guerra undertook in this case or for operations similar to the one at issue here. *See, e.g., Norris*, 855 F. App'x at 523–24; *White*, 648 F. App'x at 842–43; *cf. Hartsfield*, 50 F.3d at 955. Accordingly, the Court concludes that the law was not clearly established at the time of the incident that Guerra's preparatory steps would be insufficient or that they would otherwise be deemed

unreasonable and violative of the law.  In other words, Guerra's actions did not

violate clearly established law, and he is therefore entitled to qualified immunity

against Plaintiffs' claims.

### C.    Federal Torts Claims Act

Under the FTCA, the United States waived immunity for claims related to an

injury

> caused by the negligent or wrongful act or omission of any employee
> of the Government while acting within the scope of his office or
> employment, under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with the
> law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  Thus, the FTCA "simply allows those injured by the acts

or omissions of a government employee to recover damages in the same way that

they would if they were injured by the acts or omissions of a private person."

*Smith v. United States*, 14 F.4th 1228, 1232 (11th Cir. 2021).  This means that a

plaintiff must show that a private person would be liable for the act or omission

under state law.  "If a plaintiff fails to establish that state-law duty, . . . the United

States retains its sovereign immunity and the suit cannot go forward."  *Id*.

### 1.    The Discretionary Function Exception

The waiver of immunity under the FTCA is not absolute.  For example, it

does not extend to "the failure to exercise or perform a discretionary function or

duty . . . , whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This carve out is commonly referred to as the discretionary function exception to the FTCA. *See, e.g., Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1157 (11th Cir. 2020). "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (citation and quotation marks omitted).

A court's analysis of whether the discretionary function exception applies involves a two-part test:

> First, a court examines the nature of the challenged conduct or act to determine whether it is "discretionary in nature," meaning that it involves "an element of judgment or choice." Second, if the challenged conduct involves an element of judgment or choice, a court then determines "whether that judgment is of the kind that the discretionary function exception was designed to shield."

*Foster*, 973 F.3d at 1157 (citations omitted).

The first prong of the test focuses on "whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Id*. at 1158 (quoting *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997)). If it "specifically prescribes a course of action for an employee to follow, there is no judgment or choice involved." *Id*. at 1157 (citation and quotation marks omitted). If it does not, the court will "presume[] that the

particular act involved an element of judgment or choice." *Zelaya v. United States*, 781 F.3d 1315, 1330 (11th Cir. 2015) (quoting *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993)).

Under the second prong of the test, "[a] particular decision will be of the kind protected by the exception if it is the type of decision that one would expect to be inherently grounded in considerations of policy." *Zelaya*, 781 F.3d at 1330. However, "when a government agent is permitted to exercise discretion in making a particular decision—whether that permission is express or implied—'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Id.* (citing *Gaubert*, 499 U.S. at 324).

In the context of a law enforcement official serving an arrest warrant, the Eleventh Circuit has "conclude[d] that the investigation of the whereabouts and identity of the subject of an arrest warrant prior to service of the arrest warrant is conduct that falls within the discretionary function exception." *Mesa v. United States*, 123 F.3d 1435, 1438 (11th Cir. 1997). With respect to the first prong of the test, the court "readily" found that "decisions regarding how to locate and identify the subject of an arrest warrant" involve "an element of judgment or choice." *Id.*

With respect to the second prong of the test, the *Mesa* court explained that

> [t]he decision as to how to locate and identify the subject of an arrest warrant prior to service of the warrant is susceptible to policy

analysis.  For example, in deciding how extensively to investigate the location and identity of the subject, agents may weigh the urgency of apprehending the subject in light of such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence.  A desire to keep the investigation secret—for tactical reasons, to protect confidential sources, to protect the agents involved, or for other reasons—may also factor into the decision as to how to locate and identify the subject of a warrant.  In addition, agents may consider their available resources and decide how to allocate those resources among the many investigations for which they are responsible.  All of these factors indicate that the decision regarding how to locate and identify the subject of an arrest warrant is fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate.

*Id*.  *See also Vivas v. United States*, No. 1:20-CV-02217, 2021 WL 2582300, at *3 (N.D. Ga. Apr. 21, 2021) (stating that "decisions made by . . . officers in determining how and where to locate the subject of the warrant [served at the wrong home] are covered by the discretionary function exception").

Applying the principles set forth in *Zelaya* and *Mesa* here, this Court finds that Guerra's efforts in preparing to execute the warrant at 3741 Landau involved judgment and choice.  There was no statute, regulation or even internal operating procedure prescribing Guerra's course of action.  To the contrary, Guerra's actions involved multiple independent decisions regarding how to investigate the location where the warrant was to be served and direct the team in executing the warrant. As explained in *Mesa*, these decisions involve policy considerations and should not be subject to judicial second-guessing.

The Court is not convinced by Plaintiffs' argument that Guerra lacked discretion in executing the search warrant because the warrant identified a specific location. While it is true that the warrant named 3741 Landau as the place of execution, and the warrant therefore could not be served at another location, it is also true that Guerra had to make numerous decisions regarding *how* to execute the warrant. This is the epitome of discretion.

The Court is likewise not persuaded by Plaintiffs' attempt to distinguish the *Mesa* opinion from the facts of this case. Plaintiffs argue that *Mesa* involved only an arrest warrant, and the opinion was therefore limited to that narrow circumstance. However, the Eleventh Circuit did not expressly limit its opinion in that way, and its general discussion of the decision-making process to investigate the location of a subject is relevant here. *See Mesa*, 123 F.3d at 1438. As such, the *Mesa* opinion is apposite.

For these reasons, the Court concludes that Guerra's actions are covered under the discretionary function exception to the FTCA. This means that the Court lacks jurisdiction to consider Plaintiffs' tort claims unless they are permitted by another provision of the FTCA.[7]

---

[7] Plaintiffs noted that they wish to preserve for appeal their argument that the discretionary function exception should not apply to violations of constitutional

### 2.    The Law Enforcement Proviso

Under § 2680(h) of the FTCA, the United States expressly declined to waive immunity for specific claims, including those arising out of assault, battery, false imprisonment and false arrest.  However, this exception does not apply to (*i.e.*, immunity is waived for) six intentional torts where they concern acts or omissions of "investigative or law enforcement officers of the United States Government."[8] *Id*.  The six enumerated torts for which immunity is waived are assault, battery, false imprisonment, false arrest, abuse of process and malicious prosecution.  *Id*. This carve out for actions arising out of the conduct of law enforcement is known as the law enforcement proviso.  *See Millbrook v. United States*, 569 U.S. 50, 52-53 (2013).  The law enforcement proviso applies regardless of whether the discretionary function exception would otherwise deny jurisdiction over the claims.  *See, e.g.*, *Williams v. United States*, 314 F. App'x 253, 258–59 (11th Cir. 2009) (stating that the law enforcement proviso "waives sovereign immunity for battery claims against federal law enforcement officials, including battery claims arising out of those acts or omissions that fulfill a discretionary function").

rights.  However, as Plaintiffs concede, the Eleventh Circuit recently rejected that argument in *Shivers v. United States*, 1 F.4th 924 (11th Cir. 2021).

[8] For purposes of this provision, "a law enforcement officer is any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law."  *Williams v. United States*, 314 F. App'x 253, 258–59 (11th Cir. 2009).

Here, Plaintiffs assert tort claims for false arrest/false imprisonment (Count I), assault and battery (Count II), trespass/interference with private property (Count III), negligent/intentional infliction of emotional distress (Count IV) and negligence (Count V). The claims for false arrest, false imprisonment and assault and battery clearly fall under the law enforcement proviso.[9] Therefore, those claims survive, despite the Court's finding herein that they are excluded by the discretionary function exception. The remaining claims—for trespass, interference with private property, negligent/intentional infliction of emotional distress and negligence—are not covered by the law enforcement proviso and therefore remain excluded. Consequently, the Court lacks jurisdiction as to Counts III, IV and V of each complaint, and the United States is entitled to summary judgment on those claims. The Court has jurisdiction as to Counts I and II of the complaints and will now consider the merits of those claims.

### 3.    Merits of the Claims

As set forth above, the United States can be liable under the FTCA only to the extent that a private person would be liable under the law of the place where the incident occurred. *See* 28 U.S.C. § 1346(b)(1). Since the incident occurred in

---

[9] The parties do not dispute that Guerra is a law enforcement officer of the United States Government.

Georgia, the Court must apply the law of Georgia as it pertains to liability of a private person under the facts of this case. *See Smith*, 14 F.4th at 1232.

### a.    Count I (False Arrest/Imprisonment)

Under Georgia law, a false arrest is an "arrest under process of law, without probable cause, when made maliciously." O.C.G.A. § 51-7-1. An arrest "under process of law" is one "made pursuant to a warrant." *Ferrell v. Mikula*, 672 S.E.2d 7, 10 (Ga. Ct. App. 2008).

A false imprisonment, on the other hand, is "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20. Thus, the "key distinction" between false arrest and false imprisonment "is whether the person was detained using a warrant or not." *Ferrell*, 672 S.E.2d at 10. The *Ferrell* court expressly overruled any opinion that construed an arrest without a warrant as a false arrest. *Id*. at 13.

Whether the claim is for false arrest or false imprisonment, a defendant is liable for arresting or imprisoning a person without a warrant "unless he can justify under some of the exceptions in which arrest and imprisonment without a warrant are permitted by law." *Collins v. Sadlo*, 306 S.E.2d 390, 391 (Ga. Ct. App. 1983) (citation, alterations and quotation marks omitted). "Where the arrest is without a

warrant and is illegal, no amount of good faith or probable cause will excuse the defendants." *Id.* (citation, alterations and quotation marks omitted).

Here, Defendants argue that Plaintiffs do not have a false arrest claim because the arrest did not involve a warrant. They contend that Plaintiffs may assert only a false imprisonment claim. Defendants urge the Court to grant summary judgment on Plaintiffs' false imprisonment claim on the grounds that Guerra acted in good faith. Although Defendants acknowledge that the issue of good faith is typically a fact question, they contend that they should prevail in this case because the record is clear that no agent acted in bad faith.

Plaintiffs respond that the most analogous law applicable to private persons is Georgia's citizen's arrest law.[10] Under that statute, "[a] private person may arrest an offender if the offense is committed in his presence or within his immediate knowledge. If the offense is a felony and the offender is escaping or attempting to escape, a private person may arrest him upon reasonable and probable grounds of suspicion." O.C.G.A. § 17-4-60.

Plaintiffs argue that summary judgment is inappropriate here because Defendants cannot show that the arrest was proper under the citizen's arrest statute.

---

[10] The citizen's arrest law was in effect at the time of the incident but has since been repealed.

They point out that Plaintiffs did not commit an offense in Defendants' presence, and they were not attempting to flee at the time Defendants entered their home.

Plaintiffs further contend that O.C.G.A. § 51-7-21, which Defendants cite as a basis for their good faith defense, applies only to law enforcement officers serving a warrant. Thus, Plaintiffs assert that the statute is not applicable to an FTCA claim, which requires a private person analog law. Plaintiffs also argue that, in any event, the record does not support a good faith defense because Guerra did not exercise ordinary care in executing the warrant.

Additionally, Plaintiffs argue that Defendants waived their good faith defense. Plaintiffs maintain that Defendants may not raise a good faith defense at the summary judgment stage because they did not include the defense in their answer.

The Court agrees with Defendants that the record does not support a false arrest claim because the arrest in this case was not executed pursuant to a warrant that named Plaintiffs. *See Ferrell*, 672 S.E.2d at 10 (emphasizing that a false arrest claim is improper where there is no arrest warrant). The Court, however, disagrees that summary judgment is proper on Plaintiffs' false imprisonment claim.

First, it is not clear that the good faith defense, which constitutes Defendants' primary argument for summary judgment, applies here. O.C.G.A. §

51-7-21, which Defendants cite as support for their good faith defense, provides that "[i]f imprisonment is by virtue of a warrant, neither the party who procured the warrant in good faith nor the officer who executed the warrant in good faith shall be liable for false imprisonment even if the warrant is defective in form or is void for lack of jurisdiction." Thus, on its face, the statute relates to a law enforcement officer serving a warrant, not to an officer executing a warrantless arrest or to a private person detaining another. It is therefore doubtful that the statute applies in the instant FTCA context, which requires the Court to apply a private person analog law.[11]

Further, the citizen's arrest statute, which Plaintiffs offer as the applicable private person analog law, does not appear to contemplate a good faith defense.[12] That statute authorizes an arrest if the offense was committed in the presence of the citizen or was within his immediate knowledge. *See* O.C.G.A. § 17-4-60. A citizen may rely on reasonable and probable grounds of suspicion only in

---

[11] *Wilson v. Bonner*, 303 S.E.2d 134 (Ga. Ct. App. 1983), *Blocker v. Clark*, 54 S.E. 1022 (Ga. 1906), and *Stewart v. Williams*, 255 S.E.2d 699 (Ga. 1979), which Defendants cite in support of their good faith argument, all involve arrests by law enforcement officers serving warrants and are therefore of questionable relevance here.

[12] Defendants do not dispute that the citizen's arrest statute is a private person analog law. Their opening brief refers to the statute, *see* ECF No. 83-1 at 35, and their reply brief argues only that "[in] the absence of a private person analog, sovereign immunity has not been waived," ECF No. 107 at 15.

circumstances that involve a felony and an offender who is attempting to escape. *See id*. Defendants have not cited any case law or otherwise shown that a good faith defense would generally apply to the citizen's arrest statute or where, as here, Plaintiffs committed no offense and were not attempting to flee.

Finally, Georgia law appears to preclude a good faith defense where an arrest without a warrant is "illegal." *Collins*, 306 S.E.2d at 391. *Collins* follows cases like *Vlass v. McCrary*, 5 S.E.2d 63, 65 (Ga. Ct. App. 1939), where the Georgia Court of Appeals expressed that "no amount of good faith or probable cause will excuse . . . defendants," if the arrest is without a warrant, and it is illegal. The *Vlass* court explained that "[n]o one who properly appreciates the sacredness of personal liberty, and the jealousy of the law in guarding the same, can doubt that, as a general rule, the law requires a warrant in order to render an arrest legal." *Id*. Since the record shows that the 3741 Landau and Riley warrants were void as to Plaintiffs, and Defendants have not demonstrated that the arrest was otherwise legal, the Court disagrees that Plaintiffs' false imprisonment claim should be dismissed as a matter of law. Accordingly, the Court denies Defendants' Motion as to Count I of the complaints.[13]

---

[13] In light of this conclusion, the Court need not resolve Plaintiffs' argument that summary judgment should be denied because Defendants waived their good faith defense. The Court, however, notes that Plaintiffs have not shown prejudice from

### b.    Count II (Assault and Battery)

In Georgia, an assault is "[a]ny violent injury or illegal attempt to commit a physical injury upon a person." O.C.G.A. § 51-1-14. A battery is "[a] physical injury done to another . . . , whatever may be the intention of the person causing the injury, unless he is justified under some rule of law." *Id*. § 51-1-13. The Georgia Court of Appeals has emphasized that "the intent to cause actual physical harm to another is not absolutely essential to the viability of a civil action for battery." *Hendricks v. S. Bell Tel. & Tel. Co.*, 387 S.E.2d 593, 594 (1989). Further, "any unlawful touching is a physical injury to the person and is actionable." *Id*.

Here, Defendants cite Georgia's self-defense statute as justification for their actions. They also argue that the use of force was reasonable under the citizen's arrest statute, and it was *de minimis*.

---

the alleged failure to raise the defense sooner. *See Edwards v. Fulton Cnty.*, 509 F. App'x 882, 887–88 (11th Cir. 2013) (stating that "a defendant does not waive an affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff" and finding that the district court properly rejected a claim of waiver where the plaintiffs had the opportunity to respond to the defense at summary judgment and the subject matter of the defense was addressed during discovery).

However, the self-defense statute is clearly inapplicable under the facts of this case. It is undisputed that Plaintiffs did not resist arrest or otherwise challenge the agents.

Likewise, the cases Defendants cite regarding the reasonable or *de minimis* use of force are inapposite. Those cases involve claims under the Fourth Amendment, where the quantum of force used by officers is relevant, whereas Georgia law precludes the application of the reasonable or *de minimis* principles in a battery case. *See Hendricks*, 387 S.E.2d at 594 (stating that a battery "may be accomplished by an unauthorized caress as well as by an unauthorized blow"). Defendants also have not shown that a reasonableness or *de minimis* defense would apply to the assault claim.

Finally, the *Williams* case, which Defendants cite to support their argument that the force used in this case was reasonable, involved an arrest of a fleeing suspect for whom a warrant had been issued. *See Williams v. United States*, 314 F. App'x 253, 258 (11th Cir. 2009). The circumstances of this case are quite different.

Based on the foregoing analysis, the Court finds that Defendants are not entitled to summary judgment on Plaintiffs' false imprisonment claim (Count I) and assault and battery claims (Count II).[14]

### III.   <u>CONCLUSION</u>

In accordance with the Court's opinion herein, the Court **GRANTS** Defendants' Motion (ECF No. 83) as to Counts III, IV, V and VI of the complaints and **DENIES** the Motion as to Counts I and II.[15]  Since the sole account against Defendant Guerra (Count VI) is dismissed, the clerk is **DIRECTED** to terminate Guerra from this action.[16]

In light of these rulings, the Court finds that this is an appropriate time for the parties to mediate this dispute.  Accordingly, the parties are **DIRECTED** to mediate the remaining claims in this matter before a neutral third party within forty-five days of the date of this Order.  Within seven days of the date of this Order, the parties shall inform the Court whether they elect to mediate their dispute

---

[14] For the reasons described in footnote 12, *supra*, the Court does not reach Plaintiffs' argument that Defendants waived their justification defense.

[15] As explained above, Plaintiffs' claims for false arrest are not viable under the facts of this case.  Thus, to the extent that Plaintiffs incorporate claims for false arrest in Count I of the complaints, the claims for false arrest are hereby dismissed.

[16] The Court does not address the arguments in the "Spoliation" section of Plaintiffs' response brief because, as Defendants point out, Plaintiffs do not request any specific relief.

before a Magistrate Judge of this division; if so, the Court will make the necessary referral.

Given the Order to mediate this dispute, the Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** the case for docket management purposes. Administrative closure will not prejudice the rights of the parties to this litigation in any manner nor preclude the filing of documents.

The parties must file a status report by the conclusion of the forty-five day mediation period stating whether mediation was successful. If mediation was unsuccessful, the parties may file a motion to reopen the case with a proposed schedule to complete the remaining expert discovery in this case. Plaintiffs' motions for extension of time to complete expert discovery (ECF Nos. 114 and 119) are therefore **DENIED** without prejudice.

The Clerk is also **DIRECTED** to terminate Plaintiffs' motions to exclude Defendants' reply to Plaintiffs' Statement of Facts (ECF Nos. 109, 118) since Plaintiffs have withdrawn those motions.

**SO ORDERED** this 23rd day of September, 2022.

**J. P. BOULEE**
United States District Judge